(M 6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
THE TARGET ACCOUNTS THAT ARE
CONTROLLED BY APPLE, INC AND
LISTED IN ATTACHMENT A

Case No. **20 - 0255 JMC**

## <u>AFFIDAVIT IN SUPPORT OF SEARCH WARRANT</u>

I, James Walsh, Task Force Officer of the Federal Bureau of Investigation having been duly sworn, state as follows:

1.     I make this affidavit in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple Inc. (hereafter "Apple") to disclose to the government records and other information, including the contents of communications, associated with the above-listed Apple ID that is stored at premises owned, maintained, controlled, or operated by Apple, a company headquartered at 1 Infinite Loop, Cupertino, CA.  The information to be disclosed by Apple and searched by the government is described in the following paragraphs and in Attachments A and B.

2.     Based on the facts set forth in this affidavit and based on the investigation in which I have participated, I submit that there is probable cause to believe that Gregory BUTLER, and his associates have committed violations of 21 U.S.C. § 846 (conspiracy to possess with intent to distribute a controlled substance), and 21 U.S.C. § 841 (possession with intent to distribute and the distribution of a controlled substance).  Furthermore, I believe that there is probable cause that fruits, evidence and instrumentalities of these crimes are located within the contents of the information associated with the following accounts (collectively the "**TARGET ACCOUNTS**"):

(a)  APPLE ID normally2010@gmail.com.  This APPLE ID is linked to the device

1

which carries the telephone number 540-630-1931, IMSI 310260935529853, and ICCID 8901260932755298536.

(b) APPLE ID butlergregory2010@gmail.com. This APPLE ID is linked to the device which carries the telephone number 347-744-5958, IMSI 310260935531330 and ICCID 8901260932755313301.

(c) APPLE ID dylanstacks@icloud.com. This APPLE ID is linked to the device which carries the telephone number 808-367-5995, IMSI 310260166023442 and ICCID 8901260163760234429.

(d) APPLE ID freebands_daddy@icloud.com. This APPLE ID is linked to the device which carries the telephone number 443-720-9972, IMSI 311480351124833 and ICCID 891 480 000 034 344 80005.

3.     This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## BACKGROUND AND EXPERIENCE

4.     I am a Detective with Montgomery County Police Department (MCPD), Special Investigations Division, Drug Enforcement Section, Major Offenders/Conspiracy Unit and have been employed with the MCPD since July 2008. Prior to being employed with MCPD, from October 2001 to July 2008, I was a sworn law enforcement officer with the United States Park Police. I have been specially deputized as a Task Force Officer (TFO) by the Federal Bureau of Investigation (FBI) and has authority under Title 21, United States Code, since October of 2014. I graduated from the Federal Law Enforcement Training Center (FLETC) in 2002 and the MCPD Training Academy in January 2009.

5.     During my sixteen years as a law enforcement officer, to include the past four years

2

of conducting undercover narcotics investigations, I have performed controlled purchases of drugs and street level surveillance of drug transactions; utilized informants to make controlled purchases of drugs; worked in an undercover capacity on several occasions involving narcotics investigations targeting street level and interstate narcotics traffickers; obtained and executed search warrants as a result of drug investigations; attended numerous courses and seminars covering drug recognition, interdiction, money laundering, conspiracy investigations and secure communications interception; participated in and been a co-case agent on Title III wiretap investigations involving federal narcotics violations; and been recognized and testified as an expert in narcotics trafficking by the Circuit Court and Juvenile Court for Montgomery County, Maryland.

6.    I have been involved in the investigation of several Organized Crime Drug Enforcement Task Force (OCDETF) investigations involving drug trafficking organizations. I have extensive experience in debriefing defendants, working with confidential informants, and various persons with direct experience with the methods used to distribute controlled substances.

7.    I have also attended numerous other training classes and seminars related to undercover narcotics investigations, drug interdiction, conducting interviews, drug recognition and fraud and money laundering. Additionally, I have developed, taught and continue to teach several continuing educational courses to sworn officers on drug investigations

8.    Based on your affiant's training and experience, I am familiar with the means and methods that narcotics traffickers use to import and distribute illicit drugs. I am familiar with the support and assistance that narcotics organizations require to conduct their illegal activities. I am also become knowledgeable about the criminal statutes of the United States, particularly in the laws relating to violations of the federal narcotics and conspiracy statutes.

9.    Through this training and experience, I have learned about the importation,

3

manufacture, concealment and distribution of controlled substances, including, for example, cocaine, heroin, phencyclidine (PCP), and marijuana. I have become familiar with the use of telephones by drug traffickers to communicate, the patterns of activity of drug traffickers, the types and amounts of profits made by drug dealers, and the methods, language, and terms that are used to disguise the source and nature of the profits of illegal drug dealing. Additionally, based on your affiant's training and experience and his participation in other narcotics investigations, your affiant knows the following: that it is common for drug dealers to "front," or provide on consignment, controlled substances to their customers; that it is common for drug dealers to conceal contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residences, vehicles and/or businesses for ready access; that it is common for drug dealers to conceal proceeds from law enforcement authorities and rival narcotics traffickers; that drug dealers routinely use cellular telephones to facilitate their drug distribution operations; that drug dealing is an ongoing process that requires the development, use, and protection of a communication network to facilitate daily drug distribution; that drug dealers use telephones to thwart law enforcement efforts to penetrate the drug dealers' communication networks; and that narcotics traffickers commonly use "coded" language when speaking with other drug traffickers in order to thwart detection by law enforcement agents who may be intercepting their communications.

10. Based upon my training and experience and my participation in this and other narcotics investigations, as well as my conversations with other agents, I know the following:

a. Narcotics traffickers often maintain at locations including their residences, businesses, vehicles, and stash houses, financial records and financial instruments related to their narcotics transactions and the profits derived from those transactions including, but not limited to, currency, bank checks, cashier's checks, Western Union receipts, money

orders, stocks, bonds, precious metals, and real estate records;

b.      Narcotics traffickers frequently maintain at locations including their residences, businesses, vehicles, and stash houses, records of their narcotics transactions including, but not limited to, books, ledgers, records and other documents relating to the manufacture, transportation, possession, and distribution of controlled substances. Such documents are frequently maintained where the traffickers have ready access to them, including in their homes;

c.      Narcotics traffickers commonly maintain at locations including their residences, businesses, vehicles, and stash houses, identification and travel documents, including, but not limited to, tickets, transportation schedules, passports, notes and receipts related to travel, and motel/hotel receipts;

f.      Indicia of occupancy, residency and/or ownership of the premises to be searched are often present in such premises;

g.      Narcotics traffickers commonly maintain many of the foregoing items in cellular telephones, computer files, on disks, and on hard drives; removable storage devices such as "Thumb Drives";

h.      Narcotics traffickers commonly maintain at locations including their residences, businesses, vehicles, and stash houses, numerous cellphones that they use to contact their coconspirators, including their sources of supply, their distributors, and their customers;

i.      Narcotics traffickers often use video recording devices, including cellular telephones, to take video recordings of other members of their organization often engaging in illegal activities such as the distribution of narcotics, as well as video recordings documenting the purchase of assets with the proceeds of narcotics trafficking.

5

11.     Specifically with respect to cellular telephones, computers, and other "smart" electronic devices, such as tablets, I know the following information based upon my training, experience and participation in this and other investigations involving drugs and firearms, as well as conversations with other investigators:

a.     Individuals engaged in drug trafficking offenses often use cell phones and electronic devices to communicate with suppliers; to place orders with suppliers; to communicate with customers; to receive orders from customers; and to choose meeting times and locations for the distribution of controlled substances. The individuals engaging in drug trafficking will often use a combination of voice calls and text messages to coordinate drug transactions. Individuals engaged in drug trafficking offenses also use digital storage devices to maintain telephone number "contact lists" of individuals who may have assisted in the planning of this and other criminal activity.

b.     Drug trafficking is an ongoing and recurring criminal activity.  As contrasted with crimes against persons, which tend to be discrete offenses, drug trafficking is an illicit commercial activity that is characterized by regular, repeated criminal activity.

c.     Cellular telephones, computers, and other smart devices are an indispensable tool of the narcotics trafficking trade.  Narcotic traffickers use cellular telephones, push-to-talk telephones, Short Message Service ("SMS"), electronic-mail, and similar electronic means and/or devices, often under fictitious names or names other than their own, in order to maintain contact with other conspirators and narcotic traffickers.  In addition, narcotic traffickers will often change their cellphones following the arrest of a member of their DTO, or at random in order to frustrate law enforcement efforts.

d.     Drug traffickers often place nominal control and ownership of telephones

6

in names other than their own to avoid detection of those telephones by government agencies. Even though telephones are in the names of other people, drug traffickers retain actual ownership, control, and use of the telephone, exercising dominion and control over them.

e.     Drug traffickers utilize multiple and different types of communication devices, and change the numbers to these communication devices frequently. This is done to avoid detection by law enforcement personnel. I also know that drug traffickers will dedicate different communication devices for different aspects of the trafficking organization. An example of this would be a drug trafficker utilizing one cellular telephone to communicate with customers, and utilizing another cellular telephone to communicate with a source of supply of drugs.

f.     Cell phones and similar smart devices associated with drug traffickers include various types of evidence. They may contain relevant text messages or other electronic communications; they may contain electronic address books listing the phone numbers and other contact information associated with co-conspirators; and they may contain other types of information, including the information contained in Attachment C.

g.     The mere fact of a cellular phone's call number, electronic serial number or other identifying information may be evidentiary value as it may confirm that a particular cell phone is the phone identified during a wiretap, pen register, or other electronic investigation.

12.     I know from my training, knowledge, and experience that cell phones and other smart devices often record the phone's historical location data, indicating the location of stash houses, distribution points, and supply sources. I also know that capturing and analyzing the

7

cellular telephone geolocation of a phone used by a drug trafficker can provide important evidence of: (1) the location of the drug trafficking itself, including the spot where drug sales are conducted, solicited, or transacted; (2) the location where a drug dealer stores and stashes his drugs, including his personal residence or another dwelling used for the storing of controlled substance; (3) the location of suppliers, customers, or coconspirators that a drug dealer may meet with; (4) the location of meetings among various members of the conspiracy; (5) corroboration of physical drug trafficking activity observed by investigators; and (6) the overall pattern of travel for a particular drug trafficker. Further, the capture of geolocation information can corroborate physical observations of drug transactions and other conspiratorial conduct of POPS and others. Accordingly, the location of a cellular phone used by a drug trafficker can provide important evidence of the drug trafficking conspiracy.

13.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.

## INFORMATION REGARDING APPLE ID and iCLOUD

14.     Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

15.     Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

        a.     Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

8

b.      iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

c.      iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services, and can also be used to store iOS device backups and data associated with third-party apps.

d.      iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

e.      Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

f.     Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

g.     Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

h.     App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

16.     Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

17.     An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with

10

an Apple ID by the user.

18.     Apple captures information associated with the creation and use of an Apple ID.
During the creation of an Apple ID, the user must provide basic personal information including
the user's full name, physical address, and telephone numbers. The user may also provide means
of payment for products offered by Apple. The subscriber information and password associated
with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on
Apple's website. In addition, Apple captures the date on which the account was created, the length
of service, records of log-in times and durations, the types of service utilized, the status of the
account (including whether the account is inactive or closed), the methods used to connect to and
utilize the account, the Internet Protocol address ("IP address") used to register and access the
account, and other log files that reflect usage of the account.

19.     Additional information is captured by Apple in connection with the use of an Apple
ID to access certain services. For example, Apple maintains connection logs with IP addresses
that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud,
Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains
records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs"
for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided
email account. Records relating to the use of the Find My iPhone service, including connection
logs and requests to remotely lock or erase a device, are also maintained by Apple.

20.     Apple also maintains information about the devices associated with an Apple ID.
When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address
and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial
number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to

an Apple ID when the user signs in to FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

21. Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

**PROBABLE CAUSE**

22.     Beginning in 2016, Special Agents and Officers of the FBI, DEA and Montgomery County Police Department, Maryland (MCPD) began investigating the Gregory BUTLER drug trafficking organization (the "DTO"). Investigation revealed that BUTLER's drug trafficking was occurring as early as April 1, 2016 and that he caused fatal overdoses as early as August 2016.

23.     The DTO distributed large quantities of heroin and cocaine in and around the Baltimore metropolitan area, multiple counties throughout the state of Maryland, the state of Virginia, the state of West Virginia and Pennsylvania. In the course of the investigation, FBI/MCPD identified Gregory BUTLER, also known as "Sags," as a leader of the DTO. The DTO had several associates to include Edward HALL, Tirrell SAUNDERS, Desmond RINGGOLD, and Kareem MACK.

24.     The DTO operated in the Baltimore metropolitan area and was a narcotics source of supply for customers traveling from Maryland, Virginia, West Virginia, Pennsylvania, and the District of Columbia. BUTLER had the access and means to distribute kilogram-level quantities of heroin and cocaine, in addition to crack cocaine. Weekly narcotics distribution is estimated at a range of one or more kilograms, supplied to customers by vetted DTO re-distributors at one of several pre-determined buy locations across the Baltimore metro area. It is estimated that over five hundred individual customers purchased from BUTLER or his co-conspirators by contacting one of his many phones, purchasing between user "point" quantities and/or redistributor quantities exceeding 100 grams.

25.     On October 2, 2018, the Honorable Catherine Blake, United States District Judge for the District of Maryland, authorized the initial interception of wire and/or electronic communications occurring over (443) 641-4783 ("TT1") and (347) 744-5958 ("TT2"), cellular telephones used by Gregory BUTLER. As detailed further below, I believe BUTLER has used

13

multiple telephone numbers over the course of the investigation.

26.     On October 26, 2018, the Honorable Catherine Blake, United States District Judge for the District of Maryland, authorized the continued interception of wire and/or electronic communications occurring over (443) 641-4783 ("TT1") and (347) 744-5958 ("TT2"), cellular telephones used by Gregory BUTLER.

27.     Pursuant to a federal arrest warrant, BUTLER was arrested inside his apartment on April 3, 2019.   Pursuant to a federal search warrant, his residence was then searched.   Officers recovered 21 cellular phones inside the apartments.   As described in detail within this affidavit, I know from training and experience that drug-traffickers often utilize multiple phones to compartmentalize communications to thwart detection by law enforcement.     Indeed, the investigation revealed that BUTLER used multiple telephones to facilitate his drug trafficking.

28.     The phones recovered from BUTLER's apartment included the following **SUBJECT ELECTRONIC DEVICES**:

> 1.     Black Iphone in black case
> Sim: 8901 260 163 760 234 249
>
> 2.     Pink Iphone in brown case
> SIM: 8901 260 932 755 298 536
>
> 3.     Pink IPhone in brown case
> SIM: 8901 260 932 755 313 301
>
> 4.     Black LG flip phone
> IMEI: 359 926 081 124 300
>
> 5.     Black LG phone
> SS# 812 CYS F791 462
>
> 6.     Black ZTE in black case
> SS# 327 B64 820 BC6
>
> 7.     Black LG flip phone
> SS# 608 VTMU 835 387



FILED _____   ENTERED
LOGGED _____   RECEIVED

FEB 0 5 2020

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____   DEPUTY

8.    Black Blackberry phone
MEID: 268 435 459 802 248 692

9.    Silver Iphone
IMEI: 352 029 066 819 700

10.    Black LG flip phone
SS# 708 VTL 225 3080

11.    Black LG flip phone
SS# 611 VTS M455 294

12.    Silver Samsung
SS# RVRS 26 203 ON

13.    Black LG flip phone
SS# 708 VTL 232 3616

14.    Black Samsung flip phone
SS# R21F23N5VJP

15.    Black ZTE phone
SS# 325 153 303 054

16.    Black LG flip phone
SS# 605 CQJZ488932

17.    Black ZTE flip phone
SS# 327 B51031 BCC

18.    Black Alcatel phone
IMEI: 014827003210788

19.    Silver Iphone in gray/clear case
SIM: 8901260202782921678

20.    Black Iphone in black case
IMEI: 0134330074866713

21.    Black ZTE phone
SS# 325153326068

22.    Black Blackberry phone
SS# 268435459802247549 (in box)





FEB 0 5 2020

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

29.     On April 5, 2019 law enforcement officers obtained a federal Search and Seizure warrant for the above listed **SUBJECT ELECTRONIC DEVICES**.   These devices were forensically examined by the Montgomery County Department of Police (MCPD) Electronic Crimes Unit (ECU).   Within the above listed devices were several Apple I-Phones.   Through the digital extraction the following information was obtained on the recovered Apple devices:

> (a) APPLE ID normally2010@gmail.com. This APPLE ID is linked the device which carries the telephone number 540-630-1931, IMSI 310260935529853, and ICCID 8901260932755298536 ("Target Account 1").

> (b) APPLE ID butlergregory2010@gmail.com. This APPLE ID is linked to the device which carries the telephone number 347-744-5958, IMSI 310260935531330 and ICCID 8901260932755313301 ("Target Account 2").

> (c) APPLE ID dylanstacks@icloud.com. This APPLE ID is linked to the device which carries the telephone number 808-367-5995, IMSI 310260166023442 and ICCID 8901260163760234429 ("Target Account 3").

> (d) APPLE ID freebands_daddy@icloud.com. This APPLE ID is linked to the device which carries the telephone number 443-720-9972, IMSI 311480351124833 and ICCID 891 480 000 034 344 80005 ("Target Account 4".

30.     I know high-level drug-traffickers compartmentalize electronic communications by way of using multiple electronic devices and encrypted platforms to thwart detection by law

enforcement. I further believe the volume of phones recovered from BUTLER's apartment (21 devices) to be consistent with the manner and methods used by drug-traffickers. I know from my training and experience that drug traffickers often do not operate from fixed locations or in accordance with a regular schedule and are highly mobile in the conduct of their operations. Furthermore, I know that drug traffickers routinely switch phone numbers or obtain new phone numbers to avoid law enforcement detection. Based on interceptions discussed in this affidavit, as well as my training and experience, I believe that BUTLER used several cell phones in furtherance of drug trafficking. I believe BUTLER restricted aspects of his drug trafficking activities to specific cell phones. This is a common tactic used by drug traffickers to minimize the risk of law enforcement intercepting an entire drug trafficking organization through one cell phone.

31.     An initial review of the forensic downloads of each of the above listed electronic devices was conducted by law enforcement personnel. Each of the electronic devices on which the **TARGET ACCOUNTS** were identified contained digital evidence of drug trafficking. Specifically, the evidence on these four devices included images of large amounts of suspected drugs on digital scales, images of large amounts of heat sealed U.S. Currency, SMS text messages indicative of drug trafficking, Chats or WhatsApp messaging also indicative of drug trafficking and movies as well as images of co-conspirators of the BUTLER DTO. Based on the nature of the Apple ICloud operating system I believe that additional data related to the operation of the BUTLER DTO is stored within the TARGET ACCOUNTS.

## CONCLUSION

32.     Based on the forgoing, I request that the Court issue the proposed search warrants. Because the warrant will be served on Apple who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any

17

20 - 0 2 5 5 JMC

time in the day or night.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my

knowledge.

_____
Task Force Officer James Walsh
Federal Bureau of Investigation

Subscribed and sworn before me this ___ day of January, 2020.

_____
Honorable J. MARK COULSON
United States Magistrate Judge

FILED _____ ENTERED
LOGGED _____ RECEIVED

FEB 0 5 2020

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

MAG

## 20 - 0 2 5 5 JMC

### ATTACHMENT A
### PROPERTY TO BE SEIZED

This warrant applies to information associated with the APPLE IDs ("the Target Accounts") and other identifiers listed below that is stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at Apple Inc., 1 Infinite Loop, Cupertino, CA 95014:

(a) APPLE ID normally2010@gmail.com. This APPLE ID is linked to the device which carries the telephone number 540-630-1931, IMSI 310260935529853, and ICCID 8901260932755298536.

(b) APPLE ID butlergregory2010@gmail.com. This APPLE ID is linked to the device which carries the telephone number 347-744-5958, IMSI 310260935531330 and ICCID 8901260932755313301.

(c) APPLE ID dylanstacks@icloud.com. This APPLE ID is linked to the device which carries the telephone number 808-367-5995, IMSI 310260166023442 and ICCID 8901260163760234429.

(d) APPLE ID freebands_daddy@icloud.com. This APPLE ID is linked to the device which carries the telephone number 443-720-9972, IMSI 311480351124833 and ICCID 891 480 000 034 344 80005.

FILED_____  ENTERED
_____ LOGGED_____  RECEIVED

FEB 05 2020

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY                              DEPUTY

FILED_____ ENTERED
_____ LOGGED_____ RECEIVED

**20 - 0 2 5 5 JMC**

**ATTACHMENT B**
**ITEMS TO BE SEIZED**

FEB 0 5 2020

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY_____ DEPUTY

**I.    Files and Accounts to be produced by Apple, Inc. from April 1, 2016 through April 31, 2019.**

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple (the "Target ISP"), regardless of whether such information is located within or outside of the United States, the Target ISP is required to disclose the following information to the government for the accounts (the "Target Accounts") or any of the identifiers listed in Attachment A. Such information should include the below-described content of the subject account:

a.    All device registration or customer information associated with the account and associated devices, including name, address, email address, telephone number, MAC address, and UDID;

b.    All customer service records, including support interactions, warranty and repair information;

c.    All iTunes data, including basic subscriber information, purchase information, and iTunes Match data;

d.    All Apple retail store, online store, and gift card information associated with the account;

e.    All iCloud data existing on Apple's servers, including subscriber information, mail logs, and all iCloud content, including, but not limited to, email, photo stream, photo library, iCloud Drive, contacts, calendars, bookmarks, and Safari browsing history;

f.    All iOS device activation information and device backups, including photos and videos in the Camera Roll, device settings, app data, iMessage, SMS, and MMS messages and voicemail;

g.    All FaceTime records, including call invitation logs;

h.    All iMessage records, including capability query logs;

i.    All Find My iPhone records and transactional activity, including records of all attempts to locate, lock, or wipe the device;

j.    All My Apple ID, iForgot, and Game Center connection logs and transactional records;

k.    Subscriber Information, including the name and location, supplied by the user at the time of registration, the date the account was created and all of the services of the Target ISP used by each Target Account.

20